IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

FREDERICK A. WARD,

    **Plaintiff,**

v.

    Case No.: GJH-15-1104

STEPHEN T. MOYER, et al.,

    **Defendants.**

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Frederick A. Ward, a resident of Waldorf, Maryland, filed a 179-page civil rights Complaint under 42 U.S.C. § 1983, seeking $1,000,000.00 in punitive and compensatory damages[1] against State employees for violations of the federal and state Constitutions and Maryland regulations[2] arising out of his confinement at Patuxent Institution's Halfway House ("Patuxent").[3] Ward, who is self-represented, alleges that while at Patuxent, he endured a twenty-month pattern of harassment at the hands of halfway house employees, Lt. Wilson Moore

---

[1] Ward also seeks injunctive relief mandating his immediate release from incarceration, a written apology, and establishment of policies "to keep this from happening to someone else." ECF No. 1 at 26. Ward has been released from incarceration. For reasons noted herein, a written apology will not be mandated. Furthermore, because he is proceeding on his own behalf, Ward cannot seek relief on behalf of others. *See Fowler v. Lee*, 18 F. App'x 164 (4th Cir. 2001) (pro se litigant cannot represent a class); *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975).

[2] Ward cites the *Accardi* doctrine in support of his argument that he is entitled to relief when Patuxent personnel failed to follow known procedures. He references the *Accardi* doctrine with regard to an incident where he was placed in a suicide cell. ECF No. 1 at 8; *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (stating that failure of agency to afford an individual procedural safeguards required under its own regulations may result in invalidation of ultimate administrative determination).

[3] At the time he filed his action, Ward was serving a prison sentence within Maryland's Division of Correction ("DOC"). Ward was released on parole on May 5, 2015. ECF No. 6-3 at ¶ 36.

and case worker Susan Cozzolino.[4] As a result, Ward claims he lost his outside job and income, spent sixty-five hours naked in a cell, and was "sent back to jail for 14 months." ECF No. 1 at 26.[5]

Pending is a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment filed by counsel on behalf of Defendants Goins-Johnson, Moyer, Nero and Schaffer (ECF No. 6) and Ward's opposition response (ECF No. 8). A hearing is unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the following reasons, the dispositive motion will be granted.

I.     BACKGROUND

A. Ward's Allegations

Ward lists nine separate incidents where he believes various staff members violated his rights through harassment, threats, and punishment. Specifically, he alleges that on December 24, 2011, Lt. Wilson-Moore called him into an office and confronted him about an attempt to check out a science fiction book, *Deadhead*. Ward states he wrote to Goins-Johnson informing her of the incident and asking for clarification as to allowable library books. Ward claims that afterward, Wilson-Moore would exhibit hostility whenever the two met.

On March 14, 2012, Ward asserts he received a $50 American Express gift card from his job at Business Food Solutions. Sergeant Amedu and David Hill told Ward to put the card in the halfway house safe and notify Moore and Cozzolino in writing that he had received the gift card. Two days later, Ward was called into the office by Moore and Cozzolino and confronted about the gift card, which they considered contraband. Ward states he then gave the gift card to the

---

[4] Neither Defendant has been served with summons and the Complaint. Moore has retired from the DOC and Cozzolino no longer works at Patuxent. ECF No. 5 at 2. For reasons apparent herein, each is entitled to dismissal. Ward also indicates his desire to litigate against Assistant Warden Floor, Sgt. Enngues, Sgt. Parker, Sgt. Clark, the Inmate Grievance Office; Chief O. Johnson, and Lt. King, alleging generally that they violated "[d]ue process and ignor[ed] COMAR rules." ECF No. 1 at 26. These individuals were not named in the caption of the Complaint, and Ward does not provide specific facts upon which liability might be imposed against them.

[5] This Memorandum Opinion adopts the pagination assigned through the Court's electronic docketing system.

staff, but was threatened with receiving a "ticket" (notice of infraction) and being sent back to jail. Ward alleges he wrote to senior staff but received no response.

In April 2012, Ward claims he was confronted by Cozzolino regarding Ward charging his MP3 player in the dayroom without first obtaining Moore's approval to charge his MP3 player on state property. Ward indicates Moore previously granted him permission to charge his MP3 player. He states that the residents met with Goins-Johnson on April 12, 2012, after Moore confiscated all residents' MP3 players, and as a result they were permitted to bring wall chargers for their MP3 players. Ward alleges he then wrote Moore a letter requesting permission to bring in the approved charger, but never received a copy of the approval notice. Ward states that when he brought the charger in the following week, Moore held it for more than a week.

On July 26, 2012, Ward claims he was brought into an office with Moore, Sergeant Clark, and Cozzolino, and questioned about receiving credit card (a "green dot card") information in the mail. Ward states Moore threatened to write a ticket and send Ward back to Patuxent. Ward indicates Moore wrote a ticket that was "full of lies." Ward alleges he wrote to senior staff asking for intervention, without response. Ward was then returned to Patuxent, where he was placed naked in a cell under suicide watch with only a small blanket from July 26 until July 29, 2012. Ward states that no doctor or social worker consulted with him during this time to determine if he was in fact suicidal. Ward asserts that the hearing officer found him not guilty of an infraction, but he still lost visitation privileges. Further, he was unable to use the telephone at Patuxent because his number had been taken out of the phone system.

On August 10, 2012, Ward claims he was given a ticket for unauthorized use and hoarding of medication, purportedly at the request of Goins-Johnson. Ward filed a grievance against Moore for perjury and harassment, which Ward claims only escalated the punishment

and threats. Ward indicates that when he went home on leave he received twelve to fifteen calls during a thirty-six-hour period and was told if he missed a call, his leave would be taken forever. In addition, Ward complains that he had four jobs to complete at the halfway house (cleaning two bathrooms, the computer room, and the conference room), but other residents only had one job. Ward alleges he received a memo from Moore stating Ward would lose his leave privileges if he did not complete the assigned jobs.

Ward additionally raises the general claim that his legal mail was being opened and copied by staff.

In September 2012, Ward asserts he attended a board evaluation with Dr. Nero, Goins-Johnson, Erin Schaffer, Cozzolino, and Moore, and was told to stop writing to Goins-Johnson and Nero.

On May 1, 2013, Ward alleges he was given a ticket for his MP3 charger and removed from the halfway house. Ward alleges COMAR was violated because he wasn't brought in for the ticket within seven days of the infraction. He further claims the Inmate Grievance Office ("IGO") would not let him present evidence or witnesses at a hearing challenging the validity of the infraction.

### B. Defendants' Version of Events

Defendants present a strikingly different view of the circumstances involving Ward's participation in Patuxent's halfway house program. Ward initially was housed at Patuxent from October 8, 2003 until June 11, 2013, ECF No. 6-3 at ¶ 2, then was admitted to Patuxent's Eligible Person Program ("EPP") on or about April 20, 2005, *id.* at ¶ 3. The EPP is one of two statutory programs available at Patuxent and participation is voluntary. *Id.* at ¶¶ 4, 6.

On April 7, 2011, Ward was granted accompanied day leaves to become familiar with community resources, find employment, and accomplish basic requirements for community re-entry, such as obtaining a driver's license. ECF No. 6-4 at 7–10. On September 1, 2011, he was given leave of absence for the purpose of work/school release. *Id.* at 1–6; ECF No. 6-3 at ¶ 7. On or about September 7, 2011, Ward was transferred to Patuxent's Re-Entry Facility (REF), located in Baltimore City. ECF No. 6-3 at ¶ 10. The REF is a secured facility operated by Patuxent staff, including custody and treatment staff. *Id.* at ¶ 11. Residents are at all times, inmates under the jurisdiction of Patuxent, and are subject to the rules and regulations of Patuxent and the REF. *Id.* at ¶¶ 12–13.

On July 27, 2012, Ward was charged with violating inmate rules 118 (committing, performing, or engaging in a consensual sexual act), 310 (violating a specifically cited work release rule), and 406 (possessing, passing, or receiving contraband) after correspondence containing a "green dot card" was sent to him at the REF. ECF No. 6-5 at 7–8; ECF No. 6-3 at ¶ 14. On or about July 28, 2012, Ward was returned to Patuxent's main facility as a result of the disciplinary infraction and placed on L-1 in the Correctional Mental Health Center-Jessup ("CMHCJ"), located at Patuxent, pending evaluation. *Id.* at ¶¶ 15–16. He, like other prisoners returning from work release or parole, remained on L-1 until clinical staff was able to assess his mental health status. *Id.* at ¶¶ 17–18. L-1 is not an isolation ward, and those housed there are provided a smock to wear. *Id.* at ¶¶ 19–21. Two days after arrival, on July 30, 2012, Ward was assessed by a clinician who determined he was not a danger to himself, and was moved to L-3, a disciplinary segregation tier. *Id.* at ¶¶ 22–23.

On August 3, 2012, a hearing officer found Ward not guilty of all rule violations. ECF No. 6-5 at 8; ECF No. 6-3 at ¶ 24. Ward returned to the halfway house that same day, and lost no visitation privileges as a result of the July 27, 2012 disciplinary infraction. ECF No. 6-3 at ¶ 26.

On August 10, 2012, Ward was served a notice of rule violation charging him with violating rule 304, for the unauthorized possession, use, hoarding or accumulation of medication. ECF No. 6-6 at ¶¶ 1–2. On September 7, 2012, Ward appeared before a hearing officer and accepted an offer to reduce the matter to an incident report. *Id.* at 13. On October 4, 2012, Goins-Johnson affirmed the decision. *Id.* at 10. Both Dr. Nero and Goins-Johnson aver that they never told Ward to stop writing to them. ECF No. 6-7 at ¶ 3; ECF No. 6-8 at ¶ 4.

On May 2, 2013, Ward was served a notice of rule violation charging him with violating rule 122 (possession of a telecommunications device) and rule 406 (possession of contraband). ECF No. 6-9 at 8 and ECF No. 6-3 at ¶ 27. On May 17, 2013, a hearing officer found him guilty of violating both rules based on possession of an HTC charger. ECF No. 6-9 at 4–5 and ECF No. 6-3 at ¶ 31. Ward was sentenced to ten days of segregation, had sixty good conduct credits revoked, and had his visitation privileges suspended for six months.[6] ECF No. 6-9 at 6. That same day, Ward was placed on administrative segregation pending a board review for possession of the charger and placement on segregation. ECF No. 6-3 at 8.

On May 19, 2013, Ward wrote case manager Doggett a letter asking to be removed from the program and returned to the DOC as soon as possible. ECF No. 6-11; ECF No. 6-3 at ¶ 34. Because he signed out of the program, Ward's work release status was automatically rescinded. ECF No. 6-12 at ¶ 4. Ward was transferred to a DOC prison on June 11, 2013. ECF No. 6-3 at ¶ 35.

---

[6] The hearing officer's decision was approved by supervisor James Floor on June 5, 2013. ECF No. 6-9 at 1–2.

Ward filed two grievances with the Inmate Grievance Office ("IGO"). The first, IGO No. 20121881, was filed on September 10, 2012, based on Ward's complaint that Moore "committed perjury" in the course of charging him with rule violations in July of 2012 and in testifying against him at a subsequent disciplinary hearing. ECF No. 6-5 at ¶¶ 3 and 3(a). A hearing was conducted on September 5, 2013, before Administrative Law Judge ("ALJ") Marina Sabett. *Id.* On December 3, 2013, the ALJ dismissed the grievance, holding that Moore did not commit perjury in connection with the August 3, 2012 hearing involving the green dot card and did not harass Ward. *Id.* at 15.

Ward's second grievance, IGO No. 20130982, filed June 7, 2013, challenged the disciplinary hearing findings involving rules 122 and 406 as unsubstantiated and not based on credible evidence. *Id.* at ¶ 3(b). Testimony was not taken before ALJ Sabett because the case was limited to oral argument. *Id.* at 23. On December 3, 2013, the ALJ denied and dismissed the grievance as without merit. *Id.* at 25.

Defendants deny that staff made copies of Ward's legal mail. ECF No. 6-3 at ¶ 33.

## II.  DISCUSSION

### A. Motion to Dismiss

Defendants claim that all allegations preceding April 17, 2012, should be dismissed as outside the statute of limitations. They further claim they are entitled to dismissal on the basis of qualified immunity and have Eleventh Amendment immunity from damages sought against them in their official capacities. Defendant Moyer seeks dismissal because Ward has raised no allegations against him.

1. Standard of Review

The purpose of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss "'is to test the sufficiency of a complaint.'" *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted). A Rule 12(b)(6) motion constitutes an assertion by the Defendant that, even if the facts that plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must accept as true the well-pled facts in the complaint and view the facts in the light most favorable to the plaintiff. *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011).

2. Statute of Limitations

The incidents about which Ward complains spanned a period of nearly two years. Ward states the initial act of harassment, involving his attempts to check out a science fiction book entitled *Deadhead*, occurred on December 24, 2011. ECF No. 1 at 10. The next incident, involving an American Express gift card, took place on March 14, 2012. *Id.* at 12. A third incident involving permission to charge electronics in the TV dayroom occurred in early April of 2012. *Id.* at 14. Defendants argue these incidents are barred because they were filed outside the statute of limitations.

While there is no express period of limitations in the Civil Rights Act, federal courts generally apply the most appropriate state statute of limitations to a claim filed under 42 U.S.C. § 1983. *See Wilson v. Garcia*, 471 U.S. 261 (1985); *Burnett v. Grattan*, 468 U.S. 42 (1984); *Cox v. Stanton*, 529 F.2d 47, 49-50 (4th Cir. 1975). Maryland's general three-year statute of limitations for civil actions is most applicable to this case. *See* Md. Code Ann., Cts. & Jud. Proc., § 5-101.

Although the state statute of limitations applies, the time of accrual of the action is a federal question. *Cox*, 529 F.2d at 50.

Ward filed this action on April 17, 2015. He argues that the three-year limitations period did not begin to run until the administrative grievances filed after each incident were concluded. ECF No. 8 at 1–2. He also argues that all of the claims should be addressed, because they constitute a pattern of harassment over a period of time.

The Prisoner Litigation Reform Act provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. §1997e. The statute leaves open the limitations question for prisoners who do not file a federal action until all of their administrative grievances are concluded. This discrepancy need not be addressed here, however, because each of the nine instances set out in Ward's Complaint are alleged to be part of a continuing pattern of harassment at the hands of Defendants, and thus are timely filed.

3. Qualified Immunity

Defendants assert entitlement to qualified immunity, arguing that their conduct did not violate any clearly established constitutional right of which a reasonable public official should have been aware. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *see also Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). It is true that the Court cannot require prison officials to possess "the legal knowledge culled 'by the collective hindsight of skilled lawyers and learned judges,' but instead only 'the legal knowledge of an objectively reasonable official in similar

circumstances at the time of the challenged conduct.'" *Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007) (quoting *Jackson v. Long*, 102 F.3d 722, 731 (4th Cir. 1996)). Ward claims his incarceration was extended due to Defendants' systemic violation of known policies, resulting in Eighth Amendment and due process violations. While they counter Ward's claims with evidence and legal analysis, Defendants do not argue that their obligation to protect Ward's constitutional rights was unknown in 2011. Defendants cannot claim qualified immunity here.

    4.  Eleventh Amendment Immunity

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Penhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in State courts, *see* Md. State Gov't Code Ann., § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court.

Ward's request for monetary damages against Defendants in their official capacity for constitutional violations is barred by Eleventh Amendment immunity. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989). States and their officers, sued in their official capacities, are not "persons" subject to suit for money damages under Section 1983. *Id.* at 71; *Johnson v. Maynard*, No. ELH–12–2692, 2013 WL 4176958, at *5 (D. Md. Aug. 12, 2013).

5. <u>Supervisory Liability</u>

Defendant Moyer, Secretary of the Department of Public Safety and Correctional Services ("DPSCS"), is named in the caption of the Complaint. To the extent that Moyer is sued under the doctrine of respondeat superior, he is entitled to dismissal from suit. *See, e.g., Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). A supervisor, however, may be held liable where (1) the supervisor had actual or constructive knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to another, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994), Defendants argue that Ward has provided no factual basis to hold Moyer liable for any injury.

Under § 1983, liability is imposed on "any person who shall subject, or cause to be subjected, any person . . . to the deprivation of any rights. . . ." 42 U.S.C. § 1983. The statute requires a showing of *personal* fault, whether based upon a defendant's own conduct or another's conduct in executing a defendant's policies or customs. *See Monell v. N.Y.C. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *West v. Atkins*, 815 F.2d 993, 996 (4th Cir.1987), *rev'd on other grounds*, 487 U.S. 42 (1988) (no allegation of personal involvement relevant to the claimed deprivation); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that in order for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, it must be "affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights") (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md. 1971), *aff'd*, 451 F.2d 1011

(4th Cir. 1971)). Defendant Moyer is entitled to dismissal from suit, because there is no evidence of his personal involvement in the deprivations alleged.

### B. Motion for Summary Judgment

#### 1. Standard of Review

"When matters outside the pleading are presented to and not excluded by the court, the [12(b)(6)] motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998) (alteration in the original) (quoting Fed. R. Civ. P. 12(b)) (internal quotation marks omitted). Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### C. Analysis

In essence, Ward complains that because he questioned the actions of staff, Defendants retaliated against him by charging him with institutional infractions, ultimately resulting in his discharge from the halfway house, placement in a cell with no clothes, and interference with his legal mail. As a result, he was removed from work release status and served an additional twenty months of incarceration before release on parole.

To make out a prima facie case of retaliation, Ward has the burden of showing that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind Defendants' conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). In the prison context, Ward must establish that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not narrowly tailored to achieve such goals. *See Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985). The preservation of internal order and discipline constitutes a legitimate goal of the correctional institution. *Id.* at 532.

Retaliation claims are treated with skepticism in the prison context, because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996), quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994). Further, in order to prevail on a claim of retaliation, Ward

"must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Rice*, 40 F.3d at 75.

It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment. *Compare Burton v. Livingston*, 791 F.2d 97, 100–01 (8th Cir. 1986) ("This is rather a complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death."); *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'"); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D.N.C. 1996) (conclusory allegations of retaliation are insufficient to state claim).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Md., Inc. v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993).

When compared to the uncontroverted evidence submitted by Defendants, Ward's complaints of "harassment" do not appear to be events without independent, legitimate causes. While a voluntary participant at the halfway house, Ward was not a "free" individual living without supervision in the community; he remained under the jurisdiction of Patuxent Institution, a maximum security correctional facility within the Maryland Department of Public Safety and Correctional Services.[7] In that context, there is no improper animus found where Ward was questioned about a library book, or possession of a gift card and MP3 charger. The fact that it

---

[7] *See* https://www.dpscs.state.md.us/agencies/patuxent.shtml.

14

took a week to resolve the question of whether halfway house residents could charge their MP3 devices at a state facility does not implicate a constitutional right.

Ward's claim of mistreatment during his brief return to Patuxent following the July 27, 2012 incident involving a green dot credit card application likewise fails. Ward was housed, wearing a smock, on the mental health unit for two days until a clinician indicated he was not suicidal, and then he was removed to a disciplinary segregation tier. Clinical assessment of an individual who was removed from a halfway house and returned to a correctional setting is not a violation of constitutional dimension. Indeed, it is an affirmation that the affected prisoner may be emotionally distraught and in need of protection.

A hearing officer found no violation of institutional rules based on Ward's receipt of a green dot application, and he was returned to the halfway house on August 3, 2012, with all visitation privileges restored. Medicine hoarding charges placed against him on August 10, 2012 were reduced upon agreement to an "incident," a finding affirmed by Goins-Johnson. Ward complains that after this incident, he filed a grievance against Moore for perjury and harassment, and Moore retaliated by calling him multiple times to check on him while he was on home leave and by assigning him additional cleaning tasks at the halfway house. Clearly, closely checking the whereabouts of an offender on community leave and having that individual assigned to help clean the halfway house facility do not amount to violations of constitutional rights. Ward also complains that at a September 2012 board evaluation attended by Nero, Goins-Johnson, Schaffer, Cozzolino and Moore, he was counseled to "stop writing" to Goins-Johnson and Nero. Assuming these individuals did ask him to stop writing to them, their statements do not amount to a violation of civil rights.

Ward's claim that his legal mail was opened by staff is soundly refuted by Defendants.

Even affording his claim full accord, his claim fails. Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 821 (1977). However:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U.S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997), quoting *Lewis*, 518 U.S. at 355. "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349. Ward has not alleged, much less demonstrated, any injury to his filing or litigating cases due to any opening of his legal mail.

Finally, Ward's claims regarding the May 1, 2013 infraction for possession of a cell phone charger that led to his resignation from the halfway house program and subsequent loss of his work release job[8] fail. Ward argues his adjustment conviction is invalid because he was not brought before a hearing examiner within seven days, as required under prison regulations. He further complains that the ALJ did not permit presentation of evidence or witnesses at his IGO hearing, but instead heard argument on the record.

---

[8] Prisoners do not have a constitutionally protected right to work while detained or incarcerated, or to remain in a particular job once assigned. *See Awalt v. Whalen*, 809 F. Supp. 414, 416–17 (E.D. Va. 1992); *Altizer v. Paderick*, 569 F.2d 812, 815 (4th Cir. 1978).

Prisoners retain rights under the Due Process Clause, but prison disciplinary proceedings are not part of a criminal prosecution and the full array of rights due a defendant in such proceedings does not apply. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (*citing Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)). In prison disciplinary proceedings where an inmate faces the possible loss of diminution credits, he is entitled to certain due process protections. These include: (1) advance written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing where he is afforded the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker. *See Wolff*, 418 U.S. at 564–71. There is no constitutional right to confront and cross-examine witnesses or to retain and be appointed counsel. *See Baxter v. Palmigiano*, 425 U.S. 308, 322 (1976); *Brown v. Braxton*, 373 F.3d 501, 505–06 (4th Cir. 2004).

As long as the hearing officer's decision contains a written statement of the evidence relied upon, due process is satisfied. *See Baxter*, 425 U.S. at 323 n.5. Moreover, substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence." *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985). Federal courts do not review the correctness of a disciplinary hearing officer's findings of fact. *See Kelly v. Cooper*, 502 F. Supp. 1371, 1376 (E.D. Va. 1980). The findings will only be disturbed when unsupported by any evidence, or when wholly arbitrary and capricious. *See Hill*, 472 U.S. at 456; *see also Baker v. Lyles*, 904 F.2d 925, 933 (4th Cir. 1990). As long as there is some evidence in the record to support a disciplinary committee's factual findings, a federal court will not review their

accuracy. Clearly, such evidence was presented with regard to the two notices of infraction that resulted in adjustment hearings.

Further, the mere fact that a rule governing a deadline for the May 2013 adjustment hearing may have been violated does not necessarily equate to a due process violation.[9] *See Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1456 (4th Cir. 1990) ("[A] state does not necessarily violate the constitution every time it violates on of its rules."); *Ewell v. Murray*, 813 F. Supp. 1180, 1183 (W.D. Va. 1995) ("Even if state law creates a liberty interest, violations of due process are to be measured against a federal standard of what process is due."). There is no apparent harm caused by the brief delay found here. Further, this Court does not stand in review of a state ALJ's determination that an agency appeal be examined on the record and oral argument, rather than a reiteration of evidence and witnesses sought by Ward.

Ward's assertion that the events that led to his departure from the halfway house transfer were retaliatory is belied by the legitimate reason provided by Defendants, that he was found guilty of a disciplinary rule violation. Ward's own actions led to his decision to "sign out" from the Patuxent program and return to the restrictions of life within a secured prison setting.

### III.   CONCLUSION

For these reasons, the Motion filed on behalf of Defendants, construed both as a Motion to Dismiss and as a Motion for Summary Judgment, is granted by separate Order.

Dated: January 29, 2016

GEORGE J. HAZEL
United States District Judge

---

[9] Ward does not indicate how a brief delay in scheduling his adjustment hearing resulted in prejudice to his case.